# In the United States Court of Federal Claims

No. 09-241L
(Filed: December 20, 2011)

| | |
|---|---|
| STEVEN JENKINS, et al., Plaintiffs, v. THE UNITED STATES, Defendant. | **Fifth Amendment Takings Clause; Rails-to-Trails; National Trails System Act Amendments of 1983, 16 U.S.C. § 1247(d); Iowa Law; Scope of Railroad Easement Conveyed by Deed; Extent of Government's Taking Liability** |

*Thomas S. Stewart*, Kansas City, MO, for plaintiffs. *Elizabeth G. McCulley*, Kansas City, MO, and *Brent W. Baldwin*, *Steven M. Wald*, and *J. Robert Sears*, St. Louis, MO, of counsel.

*Frank J. Singer*, United States Department of Justice, Washington, DC, with whom was *Ignancia S. Moreno*, Assistant Attorney General, for defendant.

**OPINION**

**FIRESTONE**, *Judge*.

This lawsuit involves two rail line segments constructed in Dallas County, Iowa, known as the Perry Subdivision. The first segment runs approximately 21 miles from Waukee, Iowa to Perry, Iowa, and was constructed by the Des Moines Valley Railroad Company. The second segment runs approximately 7 miles from Perry, Iowa to Dawson, Iowa, and was constructed by the Chicago, Milwaukee, and St. Paul Railway Company. This lawsuit involves approximately 241 parcels along the Perry Subdivision.

The plaintiffs in this class action are landowners who claim to own a fee interest in land underlying the Waukee-to-Perry segment of the Perry Subdivision, previously operated by the Des Moines Valley Railroad Company and its successor-in-interest, Union Pacific. Plaintiffs claim that the defendant ("the government") affected a taking of their reversionary interest in the railroad right-of-way easements when the government approved the conversion of the subject rail line to a recreational trail pursuant to the "railbanking" provision of the National Trails System Act Amendments of 1983, 16 U.S.C. § 1247(d) (2006) ("Trails Act"). Pls.' Mem. in Supp. of Mot. for Partial Summ. J. on Liability ("Pls.' Mem.") at 1-3, ECF No. 44. Plaintiffs are now seeking just compensation under the Takings Clause of the Fifth Amendment for the alleged taking associated with the government's actions under the Trails Act. Id. at 1.

Pending before the court are the parties' cross motions for summary judgment as to whether there has been a taking of plaintiffs' property interests. For the reasons discussed below, plaintiffs' motion for partial summary judgment is **GRANTED**, and the defendant's cross motion for partial summary judgment is **DENIED.**

## I. BACKGROUND

### A. The Trails Act and Relevant Regulatory Framework

This court's recent decision in Macy Elevator, Inc. v. United States, 97 Fed. Cl. 708 (2011), summarized the general purposes and operation of the Trails Act as follows:

> Congress enacted the Trails Act to address the national problem of a reduction in rail tracks. Preseault v. Interstate Commerce Comm'n, 494 U.S. 1, 5 (1990) ("Preseault I "). The Trails Act authorizes the Surface Transportation Board

> ("STB")[1] to preserve railroad corridors or rights-of-way not currently in use for train service for possible future rail use by converting those rights-of-way into recreational trails. Id. at 5-6; 16 U.S.C. § 1241 (2006). In essence, the Trails Act allows a railroad to relinquish responsibility for a rail line by transferring the corridor to an entity that will use it as a recreational trail. Although the corridor is not used as a railroad during the period of interim trail use, it remains intact for potential future use for rail service. This process is called "railbanking."

Macy Elevator, 97 Fed. Cl. at 711 (footnotes renumbered from original). The STB's approval of railbanking and recreational trail use are authorized in connection with the STB's abandonment approval authority. Caldwell v. United States, 391 F.3d 1226, 1228-29 (Fed. Cir. 2004). In cases where a railroad and a trail operator reach an agreement for recreational trail use of the rail line, the STB will retain jurisdiction over the rail corridor and the corridor will be railbanked for possible future rail use. Id. at 1229. In such cases, the rail corridor will not be returned to the underlying fee owner:

> Before a railroad corridor may be converted into a recreational trail, the railroad must either initiate abandonment proceedings with STB under 49 U.S.C. § 10903 (2006) (where the railroad has recently had operating train service) or seek an exemption from the ordinary abandonment procedures under 49 U.S.C. § 10502 (2006) (where the railroad has had no local rail service for at least two years).[2]

---

[1] The Transportation Act of 1920, ch. 91, § 402, 41 Stat. 456, 477-78, initially gave the Interstate Commerce Commission ("ICC") authority over railroad abandonments; this authority is now held by the STB following enactment of the ICC Termination Act of 1995, 49 U.S.C. § 10101 et seq. (2006).

[2] STB's regulations provide:

> An abandonment or discontinuance of service or trackage rights is exempt if the carrier certifies that no local traffic has moved over the line for at least 2 years and any overhead traffic on the line can be rerouted over other lines and that no formal complaint filed by a user of rail service on the line (or a state or local government entity acting on behalf of such user) regarding cessation of service over the line either is pending with the Board or any U.S. District Court or has been decided in favor of the complainant within the 2-year period. The complaint must allege (if pending), or prove (if decided) that the carrier has imposed an illegal embargo or other unlawful impediment to service.

Caldwell v. United States, 57 Fed. Cl. 193, 195 (2003) ("Caldwell I"), aff'd, 391 F.3d 1226 (Fed. Cir. 2004) ("Caldwell II"). Under either procedure, abandonment of the rail line and right-of-way will not be approved by the STB if a qualified trail provider[3] submits to the STB a request to use the right-of-way as a recreational trail. If the trail provider submits a statement of willingness to assume financial and legal responsibility to the STB and the railroad, the STB will, in the case of an operating railroad, issue a Certificate of Interim Trail Use or Abandonment ("CITU") which preserves the STB's jurisdiction over the rail corridor while the parties negotiate an Interim Trail Use Agreement. See 49 C.F.R. § 1152.29(c). In cases involving the exemption procedure, such as the present case, the STB issues a Notice of Interim Trail Use or Abandonment ("NITU"), which also preserves the STB's jurisdiction over the rail corridor, allows the railroad to discontinue operations and remove track and equipment, and affords the railroad and the trail provider 180 days to negotiate a railbanking and interim Trails Act Agreement. Caldwell II, 391 F.3d at 1229–30; 49 C.F.R. § 1152.29(d). During this period, the railroad will also negotiate an agreement for the transfer of the corridor to the trail operator. [footnote omitted] "If an agreement is reached, the NITU [or CITU] automatically authorizes the interim trail use. If the [STB] takes no further action, the trail sponsor then may assume management of the right-of-way, subject only to the right of a railroad to reassert control of the property for restoration of rail service." Caldwell I, 57 Fed.Cl. at 195 (internal citations omitted); see also 49 C.F.R. § 1152.29(d)(2). If an agreement is not reached, the railroad will be allowed to abandon the line, at which time the STB's jurisdiction over the right-of-way terminates.[4]

---

49 C.F.R. § 1152.50(b) (2010). The STB must also find that the line is not necessary to carry out the government's rail transportation policy, the line is of limited scope, and continued regulation is unnecessary to protect shippers from abuse of market power. Id. § 1152.50(c). The railbanking process works in largely the same manner, whether the proceeding is exempt from the abandonment process or non-exempt.

[3] The statute defines "qualified trail provider" as a "state, political subdivision, or qualified private organization that is prepared to assume full responsibility for management of [railroad] rights-of-way and for any legal liability arising out of such transfer or such use, and for the payment of any and all taxes that may be levied or assessed against the [railroad] rights-of-way." 16 U.S.C. § 1247(d).

[4] As explained above, issuance of a CITU or a NITU is an alternative to the standard process of approving the railroad's application for abandonment. Where the STB issues an order authorizing the railroad to abandon the line and the railroad carries out the abandonment, the STB's jurisdiction over the railroad right-of-way terminates. Hayfield N. R.R. Co. v. Chicago & N.W. Transp. Co., 467 U.S. 622, 633-34 (1984); Preseault I, 494 U.S. at 7.

Macy Elevator, 97 Fed. Cl. at 711 (footnotes renumbered from original).

**B. Undisputed Facts**

**1. The NITU and Trail Use Agreement in This Case**

In this case, interim trail use was authorized by a NITU issued according to the Trails Act regulatory framework. On July 7, 2004, Union Pacific submitted a petition to the STB, requesting exemption for the abandonment of the Perry Subdivision. Pls.' Proposed Findings of Uncontroverted Fact ("Pls.' Proposed Findings"), Ex. B at 1, ECF No. 49-9. The Perry Subdivision runs from milepost 296.8 near Waukee, Iowa to milepost 275.9 (Equation milepost 275.9 = 361.8) near Perry, Iowa, and from milepost 361.8 to milepost 369.0 near Dawson, Iowa. Id., Ex. B at 1, 7. The rail line travels a total of 28.1 miles within Dallas County, Iowa. Id., Ex. B at 7. As noted above, only the segment of the rail line from milepost 296.8 to milepost 275.9—from Waukee, Iowa to Perry, Iowa ("Des Moines Valley right-of-way")—is at issue here. Def.'s Cross-Mot. & Resp. ("Def.'s Cross-Mot.") at 6, ECF No. 58.

In response to Union Pacific's exemption petition, the Iowa Natural Heritage Foundation ("Foundation") filed a petition with the STB indicating that it was interested in negotiating a trail use agreement with Union Pacific. Pls.' Proposed Findings, Ex. C. Union Pacific responded that it was willing to negotiate a trail use agreement with the Foundation. Id., Ex. D. Based on this mutual interest, the STB issued a NITU for the Perry Subdivision on October 25, 2004. Id., Ex. E. After several extensions of the negotiation period, the Foundation, by letter dated January 28, 2008, notified the STB that a trail use agreement between it and Union Pacific had been reached. Id., Ex. F.

### 2. The Original Railroad Conveyances and the Present Landowners

Plaintiffs in this action allege a Fifth Amendment Taking based on their property rights in the Perry Subdivision right-of-way established in the late nineteenth century. Beginning in the 1860s, the Des Moines Valley Railroad Company obtained property rights in conjunction with its construction of the Des Moines Valley right-of-way through a combination of voluntary conveyances and condemnation. See, e.g., Pls.' Proposed Findings ¶ 147.a; id., Ex. II.1, ECF No. 49-8 (example of a Des Moines Valley right-of-way deed); id. ¶ 146.a; id., Ex. I.1, ECF No. 49-7 (example of a condemnation proceedings report for the Des Moines Valley right-of-way). For voluntary conveyances along the rail line, the railroad company used a standard form of a right-of-way deed:

> [Grantors] hereby sell and convey to the Des Moines Valley Rail Road Company, a corporation duly organized under the laws of the State of Iowa, the right of way for railroad as the same is located said right of way to be one hundred feet in width to be used for a single or double track for said railroad and for any other Rail Road purposes or uses over and across the following described tract in the County of Dallas and State of Iowa, [legal description of the property].

See, e.g., id., Ex. II.1, ECF No. 49-8. The government concedes that the Des Moines Valley right-of-way deeds granted the railroad an easement rather than a fee under Iowa law. See Def.'s Cross-Mot. at 15; Pls.' Reply at 17.

Plaintiffs in this case are individuals and entities that claim to own land adjacent to the Des Moines Valley right-of-way during the issuance of the STB's October 25, 2004 NITU. Pls.' Mem. at 1-2. As explained in more detail below, plaintiffs argue that they are entitled to a liability finding under the pending cross motions for both the deeded and

condemned Des Moines Valley right-of-way easements,[5] arguing that the government, by authorizing the interim trail use agreement between Union Pacific and the Foundation, is liable for a taking by forestalling plaintiffs' reversionary interests in the easements. The government moves for summary judgment with respect to the deeded Des Moines Valley right-of-way easements, arguing that the deeds granted unlimited easements to the railroad, that recreational trail use falls within the scope of these unlimited easements, and that, therefore, the government is not liable for a taking. Def.'s Cross-Mot. at 2. The court will address the scope of the Des Moines Valley right-of-way deeded easements under Iowa law[6] in Part III of this opinion.

---

5 Throughout this order, the court will use the term "deeded easements" to refer to the Des Moines Valley right-of-way easements conveyed voluntarily by deed, and "condemned easements" for those obtained by condemnation order.

6 As discussed in greater detail below, the extent of plaintiffs' property interests depends on the law of the state in which the property is located. The court, in determining what, if any, property interests have been taken by the government must therefore make its determination based on Iowa law. Iowa Code § 327G.76 and 327G.77 govern the abandonment and reversion of rail corridor right-of-ways. Section 327G.76 states:

> Railroad property rights which are extinguished upon cessation of service by the railroad divest when the department of transportation or the railroad, having obtained authority to abandon the rail line, removes the track materials to the right-of-way. If the department of transportation does not acquire the line and the railway company does not remove the track materials, the property rights which are extinguished upon cessation of service by the railroad divest one year after the railway obtains the final authorization necessary from the proper authority to remove the track materials.

Section 327G.77 states:

> If a railroad easement is extinguished under section 327G.76, the property shall pass to the owners of the adjacent property at the time of abandonment. If there are different owners on either side, each owner will take to the center of the right-of-way.

The Iowa Supreme Court in Macerich Real Estate Co. v. City of Ames, 433 N.W.2d 726 (Iowa 1988) has read section 327G.76 to "provide for extinguishment [of railroad property rights] upon

The government concedes in its cross motion for partial summary judgment that the Des Moines Valley right-of-way easements obtained by condemnation are easements limited to railroad purposes under Iowa law. Id. at 25-26. Consequently, for the condemned easements, the government does not object to an entry of summary judgment that it is liable for a taking.[7] Id. at 2. However, the government contends that the extent of its liability is limited to the taking of a "railbanking" easement only.[8] Id. The court will address the extent or scope of the government's taking in Part IV of this opinion.

---

cessation of service." Id. at 729. The Eighth Circuit, applying this construction of section 327G.76, has affirmed that cessation of service, and not an abandonment finding by the Interstate Commerce Commission (the predecessor of the STB), determines the timing of abandonment. Burlington N. R.R. Co. v. Kmezich, 48 F.3d 1047, 1050 (8th Cir. 1995). However, the Iowa District Court has recently held that the Interstate Commerce Commission Termination Act of 1995 ("the ICCTA") completely preempts state regulation of the abandonment of rail lines. Cedarapids, Inc. v. Chicago, Cent. & Pac. R.R. Co., 265 F.Supp.2d 1005, 1013 (N.D. Iowa 2003) ("The Court also finds that the ICCTA preempts state regulation of the abandonment of lines of railroad."). This recent decision therefore suggests that the ICCTA preempts the state law abandonment rule outlined in section 327G.76.

Despite these varied interpretations of section 327G.76, for the purposes of this motion, the government "recognizes that the Trails Act preempts extinguishment of the easements for railroad purposes only that would otherwise occur under section 327G.76 of the Iowa Code (as construed in Macerich)." Def.'s Cross-Mot. at 26. Furthermore, as discussed in greater detail below, the court finds that the Des Moines Valley right-of-way easements encompass railroad purpose use only, making it unnecessary to address whether the easement was abandoned prior to the alleged taking. See Toews v. United States, 376 F.3d 1371, 1381 (Fed. Cir. 2004) (holding that after finding that the scope of an easement does not encompass use as a recreational trail, "it is unnecessary for us definitively to address the question of whether there had been an earlier abandonment of the easement"). The court therefore does not reach the timing of the abandonment of the Des Moines Valley right-of-way easements under Iowa and federal law.

[7] Therefore, the court will not analyze the scope of the condemned easements at issue under the parties' cross motions.

[8] At oral argument, the government preferred to use the term "railroad purpose easement" rather than "railbanking easement" to refer to the scope or extent of its taking as limited to the taking of an easement subject to possible reactivation as a railroad. However, to avoid confusion with the

## II. STANDARD OF REVIEW

When considering a summary judgment motion, the court's proper role is not to "weigh the evidence and determine the truth of the matter," but rather "to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact." United States Court of Federal Claims Rule 56(a); see also Consolidation Coal Co. v. United States, 615 F.3d 1378, 1380 (Fed. Cir. 2010). A material fact is one that "might affect the outcome of the suit," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In reviewing the facts, "all justifiable inferences are to be drawn" in favor of the party opposing summary judgment. Id. at 255.

Once the movant has shown that no genuine issue of material fact exists, the party opposing summary judgment must demonstrate that such an issue does, in fact, exist. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). To establish a genuine issue of material fact, a party "must point to an evidentiary conflict created on the record; mere denials or conclusory statements are insufficient." Radar Inds., Inc. v. Cleveland Die & Mfg. Co., 424 Fed. App'x 931, 936 (Fed. Cir. 2011) (quoting SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1116 (Fed. Cir. 1985)) (internal quotation omitted).

---

court's analysis of the scope of the deeded easements—in which the court refers to the scope as limited to railroad purposes only—the court will use the term "railbanking easement" rather than "railroad purpose easement" for Part IV of its analysis, in line with the terminology found in the regulations accompanying the Trails Act. See, e.g., 49 C.F.R. § 1152.29(a) (outlining the procedure for "using a right-of-way of a rail line proposed to be abandoned for interim trail use and rail banking pursuant to 16 U.S.C. 1247(d)").

Where there is doubt as to the existence of a genuine issue of material fact, that doubt must be resolved in favor of the nonmovant. Unigene Labs., Inc. v. Apotex, Inc., 655 F.3d 1352, 1360 (Fed. Cir. 2011) (citing Ortho-McNeil Pharm., Inc. v. Myland Labs., Inc., 520 F.3d 1358, 1360-61 (Fed. Cir. 2008)).

When the parties have cross-moved for summary judgment, the court reviews the motions under the same standards. "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts." Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1391 (Fed. Cir. 1987). When considering cross motions for summary judgment, the court evaluates each motion on its own merits and reasonable inferences are resolved against the party whose motion is being considered. Marriott Int'l Resorts, L.P. v. United States, 586 F.3d 962, 968-69 (Fed. Cir. 2009).

## III. SCOPE OF THE DES MOINES VALLEY RIGHT-OF-WAY EASEMENTS ACQUIRED BY DEED

### A. The Trails Act and the Fifth Amendment Takings Clause

The parties' cross motions for partial summary judgment center on the government's liability under the Fifth Amendment Takings Clause. This court has explained the interaction between the Trails Act and the Takings Clause as follows:

> The Takings Clause of the Fifth Amendment provides in relevant part that "private property [shall not] be taken for public use, without just compensation." U.S. Const. Amend. V. "The Amendment 'does not prohibit the taking of private property, but instead places a condition on the exercise of that power.'" Preseault v. United States, 494 U.S. 1, 11 (1990) (quoting First English Evangelical

> Lutheran Church of Glendale v. Cnty. of Los Angeles, 482 U.S. 304, 314 (1987)) ("Preseault I"). In cases involving the Trails Act, it is now settled that if the government takes private property by authorizing recreational trail use of a railroad right-of-way, the government must provide just compensation. Preseault I, 494 U.S. at 12-16. It is equally settled that "only those individuals 'with a valid property interest at the time of the taking are entitled to compensation.'" Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001). . . . Because real property rights arise from state law, the extent of the plaintiffs' property interests in the right-of-way depend on the law of the state in which the property is located. [footnote omitted] See Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Protection, 130 S.Ct. 2592 (2010). . . . Thus, the Federal Circuit has determined that a taking occurs where the issuance of the CITU or NITU authorizing recreational trail use effectively extinguishes the state property rights of reversion of the right-of-way to the fee owner.[9] As the [Federal] Circuit has recently stated, "it is settled law that a Fifth Amendment taking occurs in Rails-to-Trails cases when government action destroys state-defined property rights by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement." Ladd v. United States, 630 F.3d 1015, 1019 (Fed. Cir. 2010)[, reh'g denied, No. 2010-5010, 2011 WL 2043242 (Fed. Cir. May 26, 2011)].

Macy Elevator, 97 Fed. Cl. at 717-18 (footnote renumbered from original).

The Federal Circuit has thus explained that Fifth Amendment Takings Clause cases arising under the Trails Act present three primary questions:

> (1) who owned the strips of land involved, specifically did the Railroad . . . acquire only easements, or did it obtain fee simple estates;
>
> (2) if the Railroad acquired only easements, were the terms of the easements limited to use for railroad purposes, or did they include future use as public recreational trails;
>
> (3) even if the grants of the Railroad's easements were broad enough to encompass recreational trails, had these easements terminated prior to the alleged

[9] Regarding the government action that gives rise to a taking, the Federal Circuit has held that "[t]he issuance of the NITU is the only government action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right-of-way." Caldwell II, 391 F.3d at 1233-34; see also Ladd, 630 F.3d at 1023-24.

> taking so that the property owners at that time held fee simples unencumbered by the easements.

Preseault v. United States, 100 F.3d 1525, 1533 (Fed. Cir. 1996) ("Preseault II"); see also Ellamae Phillips Co. v. United States, 564 F.3d 1367, 1373 (Fed. Cir. 2009). In sum, if the railroad received only a railroad purpose easement and if the recreational trail use and railbanking authorized by the NITU exceed the scope of that easement and therefore prevented expiration of the easement and reversionary interests from vesting in the fee owners, then a taking has occurred. See Ladd, 630 F.3d at 1019.

The core of the parties' dispute centers on two issues arising under the second step of the Preseault II framework. First, plaintiffs argue that the Des Moines Valley right-of-way easements—whether acquired through condemnation or by deed—were limited to railroad purposes, and that recreational trail use is beyond the scope of these easements. Pls.' Mem. at 15 ("The railroad held an easement limited to railroad purposes over Plaintiffs' land and nothing more."). The government does not object to an entry of summary judgment for a taking with respect to the condemnation easements. Def.'s Cross-Mot. at 2. However, the government moves for summary judgment as to the easements conveyed by deed, arguing that the deeded easements are unlimited, and that use of a public recreational trail falls within the scope of these unlimited easements. Id. ("[T]he relevant deeded easements were not expressly limited to railroad purposes only and embrace recreational trail use.").

Second, with respect to the easements granted by condemnation (and the deeded easements to the extent that the court finds that they were for railroad purposes only), the

government seeks an entry of summary judgment that limits the scope of the government's taking liability to the taking of an easement for railbanking only, not for trail use. Id. ("[T]he United States . . . does not object to the entry of summary judgment against it for the taking of an easement for railroad purposes. The easement taken is not one for recreational trail use."). Plaintiffs respond that the government's taking liability includes both trail use and railbanking. Pls.' Reply at 12.

It is not disputed that the Des Moines Valley right-of-way deeds conveyed an easement to the Des Moines Valley Railroad Company. Thus, under the framework laid out in Preseault II, the court now turns to the scope of the railroad easements acquired by deed and whether the Trails Act has prevented the reversion of plaintiffs' property rights under Iowa law. The court will then address the scope of the government's taking liability in Part IV of this opinion.

**B. Scope of the Deeded Easements**

The court now takes up the question of whether, under Iowa law, the scope of the easements granted to and held by the railroad encompass use as a recreational trail under the Trails Act. Several state courts have found that such a compensable taking has resulted under their respective state laws in connection with railroad purpose easements. See, e.g., Preseault II, 100 F.3d 1525 (Vermont); Lawson v. State, 730 P.2d 1308 (Wash. 1986) (Washington); Pollnow v. State Department of Natural Resources, 276 N.W.2d 738 (Wisc. 1979) (Wisconsin); Glosemeyer v. United States, 45 Fed. Cl. 771 (2000) (Missouri); Toews v. United States, 376 F.3d 1371 (Fed. Cir. 2004) (California); Rogers v. United States, 90 Fed. Cl. 418 (2009) (Florida); Macy Elevator, 97 Fed. Cl. 708 (2011)

(Indiana); Capreal, Inc. v. United States, 99 Fed. Cl. 133 (2011) (Massachusetts); Ybanez v. United States, 98 Fed. Cl. 659 (2011) (Texas); Biery v. United States, 99 Fed. Cl. 565 (2011) (Kansas). In several other states, courts have found that the STB's authorization of railbanking and recreational trail use does not give rise to a taking based on the terms of the railroad's easements in those cases and the applicable state law. See Moody v. Allegheny Valley Land Trust, 976 A.2d 484 (Pa. 2009) (Pennsylvania); Chevy Chase Land Co. v. United States, 733 A.2d 1055 (Md. 1999) (Maryland); Wash. Wildlife Preservation, Inc. v. State, 329 N.W.2d 543 (Minn. 1983) (Minnesota).

The court will now analyze the deeded conveyances at issue in this case in the context of Iowa law to determine if the easements are sufficiently broad to encompass use as a recreational trail.

**1. General Principles of Deed Interpretation Under Iowa Law**

An easement in Iowa may be created by deed, condemnation, prescription, necessity, or implication. See, e.g., McKinley v. Waterloo Railroad Co., 368 N.W.2d 131, 135 (Iowa 1985) (discussing easements created by condemnation); Nichols v. City of Evansdale, 687 N.W.2d 562, 568 (Iowa 2004) (noting that an easement may be created "(1) by express grant or reservation, (2) by prescription, (3) by necessity, and (4) by implication"). The Iowa courts distinguish railroad easements conveyed by deed and easements created by condemnation, characterizing easements created by deed as "in

essence a contract."[10] McKinley, 368 N.W.2d at 135. Therefore, the court will apply Iowa contract principles when interpreting the scope of the right-of-way deeds.

In the interpretation of written contracts in Iowa, "the cardinal principle is that the intention of the parties must control; and except in cases of ambiguity, this is determined by what the contract itself says." Wiegmann v. Baier, 203 N.W.2d 204, 208 (Iowa 1972). The parties' intentions are ascertained by applying general contract principles. See Flynn v. Michigan-Wisconsin Pipeline Co., 161 N.W.2d 56, 64-65 (Iowa 1968). In Iowa, courts may interpret the plain language of a contract in the context of extrinsic evidence: "Words and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight." Pillsbury Co. v. Wells Dairy, Inc., 752 N.W.2d 430, 436 (Iowa 2008) (quoting Fausel v. JRJ Enters., Inc., 603 N.W.2d 612, 618 (Iowa 1999)). The trial court, "as fact-finder[,] . . . choose[s] between 'reasonable inferences that [could] be drawn from the extrinsic evidence.'" Kersey v. Babich, 780 N.W.2d 248 (Iowa App. 2010) (quoting Pillsbury, 752 N.W.2d at 436). These rules of contract interpretation are applicable to construction of easement grants. Wiegmann, 203 N.W. at 208; see also McGrane v. Maloney, 770 N.W.2d 851 (Iowa App. 2009); Macerich Real Estate Co. v. City of Ames, 433 N.W.2d 726, 728 (Iowa 1988). In interpreting easement grants, "liberal construction should be given as will effectuate the intention of the parties, and fully protect the rights of the grantor and

[10] Therefore, contrary to plaintiffs' argument, the court's interpretation of the deeded easements will not be informed by the 1860 Iowa condemnation statute. See Pls.' Mem. at 16-17 (citing Daniels v. Chicago & N.W. Railroad Co., 35 Iowa 129, at *3 (Iowa 1872) (holding under Iowa law, by condemnation, the railroad only acquires an easement limited to railroad purposes)).

his assigns." Keokuk County v. Reinier, 288 N.W. 676, 678 (Iowa 1939), abrogated on other grounds by Lowers v. United States, 663 N.W.2d 408 (Iowa 2003).

**2. The Des Moines Valley Right-of-Way Deeded Easements are Limited to Railroad Purposes Under Iowa Law**

As noted above, the parties agree that the pertinent language in the deeds at issue is:

> [Grantors] hereby sell and convey to the Des Moines Valley Rail Road Company, a corporation duly organized under the laws of the State of Iowa, the right of way for railroad as the same is located said right of way to be one hundred feet in width to be used for a single or double track for said railroad and for any other Rail Road purposes or uses over and across the following described tract in the County of Dallas and State of Iowa, [legal description of the property].

Pls.' Proposed Findings, Ex II.1. The dispute between the parties revolves around the scope of these deeded easements. Plaintiffs argue that the deeds conveyed an easement limited to railroad purposes. Pls.' Mem. at 18-21 (relying primarily on Estate of Rockafellow v. Lihs, 494 N.W.2d 734 (Iowa App. 1992); Hawk v. Rice, 325 N.W.2d 97 (Iowa 1982); and Macerich, 433 N.W.2d 726 (Iowa 1988)).[11] The government argues that the Des Moines Valley right-of-way deeds conveyed unlimited easements—and that trail use falls within the scope of these easements—because (1) the Des Moines Valley right-of-way deeds differ from other deeds that the Iowa courts have found to be limited to railroad purposes, (2) the Des Moines Valley right-of-way deeds are similar to deeds

---

[11] Plaintiffs also argue that in Iowa, railbanking and public recreational trail use always fall outside the scope of an easement for railroad purposes. Pls.' Mem. 21-36. The government does not argue that trail use falls within the scope of a railroad purpose easement under Iowa law. The government conceded at oral argument that if this court found that the Des Moines Valley deeded easements were limited to railroad purposes, takings liability would attach. Therefore, the court does not address this aspect of plaintiffs' argument.

from other states that courts have held to allow for trail use, and (3) under Iowa law governing general easements, trail use is not more burdensome than rail use, and furthers the Des Moines Valley easements' purpose as a passageway. Def.'s Cross-Mot. at 15-25. After examination of the parties' arguments and relevant Iowa law, the court concludes that the Des Moines Valley right-of-way deeds are limited to railroad purposes only.

**a. Iowa courts have found that similar language conveys an easement for railroad purposes only.**

Ultimately, the Iowa case law that directly addresses whether a deeded easement is limited to a specific purpose dictates that the Des Moines Valley right-of-way deeded easements are limited to railroad purposes, based on the language in the deeds that reveals the intent of the grantors. The court will discuss each case in turn.

In Macerich Real Estate Co. v. City of Ames, 433 N.W.2d 726 (Iowa 1988), the Iowa Supreme Court found that the following deed conveyed an easement for railroad purposes only:

> File for record March 20, 1874, at 2 o'clock p.m., Iowa & Minnesota Railway Company in consideration of the sum of $10.00, the receipt which is hereby acknowledged L.P. Hoggatt and Abigal Hoggatt, his wife, hereby sell and convey to the Iowa & Minnesota Railway Company *the right-of-way 100 feet in width for a single or double railroad track as the same is located through the following lands*, to-wit: [description of land].

433 N.W.2d at 727-28 (emphasis added). Upholding the finding of the trial court, the Iowa Supreme Court held that "the deeds in this case conveyed to the railroad only an easement for railroad purposes." Id. at 729. The Macerich deed is similar to the Des Moines Valley right-of-way deeds, which recite "the right of way *for railroad as the same is located said right of way to be one hundred feet in width to be used for a single*

*or double track for said railroad* and for any other Rail Road purposes or uses." Pls.' Proposed Findings, Ex II.1 (emphasis added).

In arguing for a more expansive interpretation, the government first contends that the Des Moines Valley right-of-way deeds are distinguishable from the Macerich deeds because the Des Moines Valley deeds contain the clause "for any other Rail Road purposes or uses." Def.'s Cross-Mot. at 18. Second, the government argues that the Iowa Supreme Court's interpretation in Macerich has little value because the Macerich court, without discussion, held that the deeds were limited to railroad purposes. Id. However, recent Iowa case law belies defendant's contention and supports the conclusion of the Macerich court.

In Estate of Rockafellow v. Lihs, 494 N.W.2d 734 (Iowa App. 1992), the Iowa Court of Appeals considered the following deed:

> [Grantors] . . . give, remise, release, convey and quitclaim to the said Burlington, Cedar Rapids & Minnesota Railway Company for the purpose of constructing a railroad thereon and for all purposes connected with the construction and use of the said railroad the right-of-way for the said road over and through the described tract. . . .

Id. at 735. The deed also contained an habendum clause[12] with a reverter provision, which allowed the easement to revert to the grantor when the railroad stopped using it:

[12] "At common law the object of an habendum clause in a deed was to define the grantee's estate, but where the estate has been clearly defined and expressed in the premises or granting clause, if the habendum clause is inconsistent or repugnant thereto, it must yield to the granting clause. The habendum will not be permitted to defeat the clear intent of the grantor expressed in the granting clause. The modern rule in this state is to gather the intent of the grantor from the entire instrument and the circumstances surrounding its execution." Blair v. Kenaston, 273 N.W. 184, 186 (Iowa 1937) (citations omitted).

> To have, hold and enjoy the land described . . . for any and all uses and purposes in any way (sic) construction, preservation, occupation and enjoyment of the said railroad. Provided, however, that if said railway company or their assigns shall at any time hereafter cease permanently to use said road . . . then and in that case said land hereby granted shall revert to the said grantors, their heirs or assigns.

Id. Adopting the findings of the trial court, the Rockafellow court concluded that the deed at issue conveyed an easement for railroad purposes only. Id. at 736.

The language in the granting clause of the Rockafellow deeds is similar to the Des Moines Valley right-of-way deeds. Compare Pls.' Proposed Findings, Ex. II.1 ("for railroad as the same is located said right of way to be one hundred feet in width to be used for a single or double track *for said railroad and for any other Rail Road purposes or uses*" (emphasis added)), with Rockafellow, 494 N.W.2d at 735 ("*for the purpose of constructing a railroad thereon and for all purposes connected with the construction and use of the said railroad* the right-of-way for the said road over and through the described tract" (emphasis added)). Furthermore, the Rockafellow deeds include the clause similar to the Des Moines Valley right-of-way deeds—"for all purposes connected with the construction and use of the said railroad"—that the government complains the Macerich deeds lack. The Rockafellow decision therefore suggests that the Des Moines Valley right-of-way deeds, even with the clause "for any other Rail Road purposes and uses," are limited to railroad purposes.

The government's attempt to distinguish the Rockafellow deeds based on the reverter clause is unavailing. See Def.'s Cross-Mot. at 23. The Rockafellow court relied on language outside of the reverter clause to hold that the deeds at issue granted an easement for railroad purposes only:

> [the] granting clause conveyed a "right-of-way" for the purpose of "constructing a railroad thereon and for all purposes connected with the construction and use of said railroad." Such language . . . conveyed to the railroad only an easement for railroad purposes.

Rockafellow, 494 N.W.2d at 736 (quoting and adopting the findings of the trial court). While the Rockafellow court went on to bolster its conclusion with language in the habendum clause, it did not rely on language in the reverter clause. See id. ("The Habendum clause . . . provides that the railroad's interest was 'for any and all occupation and enjoyment of the said railroad.' This further suggests an easement solely for railway purposes was conveyed by the grantor . . . to the railroad.") (quoting the findings of the trial court).[13]

---

[13] The Iowa Court of Appeals opinion in Allied Gas & Chemical Co., Inc. v. World Food Processing, Inc., No. 00-1800, 2002 WL 571476, at *1 (Iowa App. Mar. 13, 2002) (unpublished opinion), also suggests that the deeds at issue are limited to railroad purposes under Iowa law. Although Allied Gas is an unpublished opinion and thus does not constitute controlling legal authority, unpublished opinions may be used for their persuasive value under Iowa law. Johnson v. Baum, 788 N.W.2d 397, 2010 WL 2757192, at *2 (Iowa App. 2010) (table). In Allied Gas the Iowa Court of Appeals considered the following deed:

> [Description of land]. The said strip of land being twenty-five feet on each side of the center of the line of said Railroad, as now located by said Company; to have and to hold said strip of land for all purposes incident or necessary to the construction and operation of a Railroad and Telegraph lines or lines thereon.

Allied Gas, 2002 WL 571476, at *1. The main dispute in Allied Gas was whether this easement was abandoned when the railroad transferred the easement to a private company. The court noted, while discussing whether the deed granted a fee or an easement, that "there is no dispute that the . . . deed . . . conveyed to the railroad an easement for railroad purposes." Id. at *3. In making its abandonment finding, the Iowa Court of Appeals further commented on the scope of the easement issue:

> It is incumbent upon us to apply the standard that "a deed should be construed, if at all possible, to effectuate the intent of the grantor." Davies v. Radford, 433 N.W.2d 704, 705 (Iowa 1988). In this case, the 1882 deed conveyed a strip of land to the railroad company, 'to have and to hold said strip of land for all purposes incident or necessary to the construction and operation of a Railroad and Telegraph lines or lines thereon.' The

Moreover, the above cases refute the government's contention that because the Des Moines Valley right-of-way deeds do not use the words "railroad purposes only" or language akin to "only," the deeds create unlimited easements. Def.'s Cross-Mot. at 17 (citing Haack v. Burlington N., Inc., 309 N.W.2d 147, 150 (Iowa App. 1981) and Johnson v. Burlington N., Inc., 294 N.W.2d 63, 64 (Iowa App. 1980), cases involving right-of-way deeds that conveyed easements "for railroad purposes only"). The government argues that, under Iowa case law, the Des Moines Valley deeds simply convey a "right-of-way" and that a deeded right-of-way in Iowa "may be used for any purposes to which the land accommodated thereby may reasonably be devoted unless the grant contains specific limitations . . . ." Def.'s Cross-Mot. at 17 (quoting McDonnell v. Sheets, 15 N.W.2d 252, 255 (Iowa 1944) (internal quotations omitted)). The government argues that the clause in the Des Moines Valley right-of-way deeds that conveys an

---

> grant of the right-of-way was limited to a specific purpose, to permit the construction and operation of a railroad.

Allied Gas, 2002 WL 571476, at *4.

The Allied Gas deed also contains similar limiting language to the deeds at issue in this case. Compare Pls.' Proposed Findings, Ex. II.1 ("for railroad as the same is located said right of way to be one hundred feet in width to be used for a single or double track *for said railroad and for any other Rail Road purposes or uses*" (emphasis added)), with Allied Gas, 2002 WL 571476, at *1 ("to have and to hold said strip of land *for all purposes incident or necessary to the construction and operation of a Railroad* and Telegraph lines or lines thereon" (emphasis added)). Furthermore, the Allied Gas court did not rely on a reverter clause in commenting on the scope of the Allied Gas easements, further confirming that the presence of a reverter clause is unnecessary under Iowa law to create a limited easement. Like Macerich and Rockafellow, the findings of the Allied Gas court therefore suggest that Iowa courts would limit the Des Moines Valley right-of-way deeds to railroad purposes.

easement "to said railroad . . . to be used for a single or double track for said railroad and for any other Rail Road purposes or uses" is not a "specific limitation" under Iowa law that would create a railroad purpose easement. Def.'s Cross-Mot. at 17. Instead, the government argues, these words are "words of description and not of limitation." Id. (citing Wiegmann v. Baier, 203 N.W.2d 204, 208 (Iowa 1972)). However, while Iowa courts have certainly held deeds containing the phrase "for railroad purposes only" as limited to railroad purposes, see, e.g., Haack, 309 NW.2d at 150, Macerich and Rockafellow suggest that such language is not necessary in order to render a deed limited to railroad purposes. Based on the above analysis, the court agrees with plaintiffs that the deed language at issue in this case is enough to limit the Des Moines Valley right-of-way deeds to railroad purposes.

Iowa contract law principles, as applied by Iowa courts, compel the same result. As noted above, in Iowa, "[w]ords and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight." Pillsbury, 752 N.W.2d at 436 (quoting Fausel, 603 N.W.2d at 618). The court, "as fact-finder[,] . . . choose[s] between 'reasonable inferences that [could] be drawn from the extrinsic evidence.'" Kersey, 780 N.W.2d 248 (Iowa App. 2010) (quoting Pillsbury, 752 N.W.2d at 436). In a decision not directly addressing the scope-of-the-easement issue, the Iowa Supreme Court concluded that the intention of the parties is clear "in matters involving narrow tracts of land acquired by railroad companies." Lowers v. United States, 663 N.W.2d 408, 410-11 (Iowa 2003). In deciding whether a deed granting a railroad a "right-of-way" conveys an easement or a fee, the Iowa

Supreme Court has commented that "[t]here is but one single reason for all such conveyances irrespective of whether the deed conveys a fee or an easement. . . . [T]he parties know the tract will be used for a railway; for what other purpose would a railroad purchase a strip of land across a farm." Id. (quoting Turner v. Unknown Claimants of Land, 207 N.W.2d 544, 546 (Iowa 1973)). Applying this proposition to the language of the Des Moines Valley deeded easements supports the conclusion that, under Iowa law, the Des Moines Valley right-of-way deeds are limited to railroad purposes only.[14]

**b. Other cited cases do not directly address the scope-of-the-easement issue.**

The other cases the parties rely on do not directly speak to the scope of the easement issue. In McKinley v. Waterloo Railroad Co., 368 N.W.2d 131 (Iowa 1985), the Iowa Supreme Court discussed primarily whether a condemned easement and a deeded easement, both granted to a railroad, were abandoned when the railroad ceased to

[14] The Iowa cases addressing these principles of deed interpretation that the government relies on also do not support an expansive construction of the Des Moines Valley right-of-way deeds. In McDonnell v. Sheets, the Iowa Supreme Court found that a deed granting a driveway for "the privilege of ingress and [egress] to the rear of [grantor's] property, with team and wagon" was a general "right-of-way" deed and did not limit the type of vehicle that could travel on the driveway. 15 N.W.2d at 255. In so deciding, the Iowa Supreme Court looked to not only the language of the granting clause, but the "practical construction which the parties placed on [the] agreement" based on the parties past use of the easement. Id. In Wiegmann v. Baier, the Iowa Supreme Court held that an easement granting use of a driveway "in the same manner as the same has been heretofore used" would not limit the grantees to using the driveway to park—the original use of easement—rather than using the driveway to provide automobile access to a garage on the grantees' property—the current use of the easement. 203 N.W.2d at 207. In interpreting the above-quoted clause as "words of description and not of limitation," the Iowa Supreme Court in Wiegmann relied on the clear intention of the parties "to grant unlimited right of ingress and egress." Id. at 208. As noted above, the Iowa Supreme Court in Lowers has found that the intent that the parties would place on easements granted for use by a railroad would limit those easements to railroad purposes only, in contrast to general right-of-way easements.

operate for a certain period. Id. at 132-133. The McKinley court held that the deeded easement conveyed a fee subject to an executory limitation to the railroad. Id. at 138. The McKinley court did not, therefore, analyze whether the language of the deed conveyed an easement for railroad purposes only.[15]

Similarly, in Hawk v. Rice, the Iowa Supreme Court addressed only whether a deed "for all uses and purposes connected with the construction and use of said Railroad" conveyed an easement or a fee interest. 325 N.W.2d at 98. The Hawk court, relying on a long line of Iowa cases, held that a deed conveying land for uses connected with the construction and operation of a railroad conveys an easement rather than a fee. Id. at 99. Here, it is undisputed that the deeds and condemnation reports subject to the liability findings of the pending cross motions conveyed an easement, not a fee. While the Hawk court noted that "[t]he granting clause [in the deeds at issue] expressly described the conveyance in this case as a right of way for construction and operation of a railroad," the court did not otherwise directly speak to the scope of the conveyance. Id. at 99.

Furthermore, the government highlights that the conclusion in Hawk has been abrogated by the Iowa Supreme Court in Lowers v. United States, 663 N.W.2d 408, 410-11 (Iowa 2003). In Lowers, the Iowa Supreme Court held that a conveyance of land for railroad uses does not necessarily convey an easement, rather than a fee, even if the deed is titled "Rt. Of Way Deed." Id. The Lowers court opined that the intended use of a

---

[15] As noted above, the court agrees with the government that the holding in McKinley suggests that Iowa courts treat deeded easements and condemned easements differently under Iowa law. See Part III.B.1, supra.

conveyance is irrelevant to a determination of the nature of the conveyance. Id. at 410 ("Determining the nature of the interest conveyed by reference to the intended use by the grantee seems frivolous in matters involving narrow tracts of land acquired by railroad companies.").

Based on the holding in Lowers, the government seeks to undermine plaintiffs' argument in two respects. First, the government attempts to distinguish Macerich Real Estate Co. v. City of Ames, 433 N.W.2d 726 (Iowa 1988), which, as noted above, held that a deed similar to the Des Moines Valley right-of-way deeds created an easement limited to railroad purposes only. Id. at 729. The government argues that Lowers abrograted Hawk, and Macerich, in part, relies on Hawk. Def.'s Cross-Mot. at 19. Specifically, the government contends that the ruling in Lowers rejects a line of Iowa cases, including Hawk, which hold that an easement for railroad purposes, rather than a fee, is granted by a deed that describes the anticipated use of the subject property as use for a railroad. This holding, the government concludes, therefore undermines Macerich. The court, however, finds the government's argument misplaced. The decision in Lowers abrogates Hawk only to the extent that Hawk held that a deed conveying a parcel meant for a rail corridor results in the creation of an easement rather than a fee. See Lowers, 663 N.W.2d at 410-11. Lowers does not speak to the scope-of-the-easement issue, and therefore does not reach the Macerich court's holding that the Macerich deeds were limited to railroad purposes only.

Second, the government lifts the following language from Lowers to suggest that a deed must be construed independent of the peripheral use of the land conveyed:

"Determining the nature of the interest conveyed by reference to the intended use by the grantee seems frivolous in matters involving narrow tracts of land acquired by railroad companies." Lowers, 663 N.W.2d at 410. The government, however, improperly extends this language to stand for the proposition that whether a deed conveys an easement for railroad purposes or general purposes must be determined regardless of the stated purpose of the conveyance. To the contrary, the Lowers court held only that whether a deed conveyed a *fee or an easement* must be determined regardless of the stated purpose of the conveyance. See Lowers, 663 N.W.2d at 410-411. In fact, under Iowa law, the stated purpose of a deed as understood by the original parties will greatly influence the scope of the easement at issue. "[I]f the principal purpose of the parties is ascertainable it is given great weight." Pillsbury Co., 752 N.W.2d at 436 (quoting Fausel v. JRJ Enters., Inc., 603 N.W.2d at 618). The Lowers court recognizes this principle:

> There is but one single reason for all such conveyances irrespective of whether the deed conveys a fee or an easement. As we stated in Turner v. Unknown Claimants of Land, 207 N.W.2d 544, 546 (Iowa 1973), "[o]rdinarily the parties know the tract will be used for a railway; for what other purpose would a railroad purchase a strip of land across a farm."

Lowers, 663 N.W.2d at 410-11. The government's attempts to undermine Macerich based on Lowers therefore falls short. The holding in Lowers further confirms that the Iowa courts would recognize that the parties in this case intended the Des Moines Valley deeds to be limited to railroad purposes only.

**c. The out-of-state law cited by the government is distinguishable and does not apply.**

Finally, the government attempts to support its position that the Des Moines Valley right-of-way deeds convey general easements by analogizing the deeds to those in Chevy Chase Land Co. v. United States, 733 A.2d 1055 (Md. 1999), and Moody v. Allegheny Valley Land Trust, 976 A.2d 484 (Pa. 2009). Def.'s Reply at 12. In both cases, the Maryland and Pennsylvania courts, respectively, held that the right-of-way deeds at issue were broad enough to encompass any "road" use, including recreational trail use. Moody, 976 A.2d at 490-91; Chevy Chase, 733 A.2d at 1073. The Moody court relied heavily on the word "Road" in the following habendum clause to find that recreational trail use was not outside the scope of the original easement: "To have and to hold the said rights and privileges to the use of [Conrail], so long as the same shall be required for the use and purposes of said Road . . ." Moody, 976 A.2d at 490-91. The Chevy Chase court found that a deed that conveyed a "free and perpetual right of way" and that did not mention "railroad purposes" did not limit the easement at issue to railroad purposes. Chevy Chase, 733 A.2d at 1073.

First, the court notes that the Moody and Chevy Chase decisions have no precedential value in Iowa. However, regardless of their precedential value, the language of the Moody and Chevy Chase deeds differs from the language of the deeds at issue in this case. Neither the Moody nor the Chevy Chase deeds contain the phrase "for said railroad and for any other Rail Road purposes or uses," which can be found in the Des Moines Valley right-of-way deeds. In fact, the Chevy Chase court specifically

distinguished from the case before it cases in which deeds contained the phrase "for railroad purposes." Chevy Chase, 733 A.2d at 1073 (citing E. Wash. Ry. Co. v. Brooke, 223 A.2d 599, 603 (Md. 1966) (holding a deed granting a strip of land "'for railroad purposes'" was limited to "an easement for railway purposes and use only")). The deeds in Chevy Chase also included the words "free" and "perpetual." Chevy Chase, 733 A.2d at 1073. The Chevy Chase court relied on these words in construing the easement as one without limitation. Id. Similar language cannot be found in the Des Moines Valley right-of-way deeds. Similarly, the Moody court interpreted the word "Road" in the deed at issue as having a very broad definition, not limited to "railroad." Moody, 976 A.2d at 491. In contrast, the Des Moines Valley right-of-way deeds use the phrases "railroad" and "Rail Road," suggesting a more limited purpose. See Pls.' Proposed Findings, Ex. II.1. For these reasons, the court declines to follow the Maryland and Pennsylvania courts in construing the present deeds.

In light of the forgoing, applying Iowa law to the language and circumstances surrounding the Des Moines Valley right-of-way deeds reveals that the grantors of the easements intended that those easements would be used for railroad purposes only. The government conceded at oral argument that if the Des Moines Valley right-of-way easement deeds were limited to railroad purposes only, recreational trail use would fall outside of these deeded easements under Iowa law. Accordingly, plaintiffs' motion for

summary judgment as to the deeded easements is **GRANTED**, and the government's motion for partial summary judgment is **DENIED.**[16]

## IV. EXTENT OF THE GOVERNMENT'S TAKING LIABILITY

Having determined that the government is liable for the taking of plaintiffs' property, the court now turns to the government's argument that the scope of its taking liability is limited to railbanking[17] required under the NITU. Def.'s Cross-Mot. at 27. Specifically, the government argues that "the plain language of the Trails Act and the Federal Circuit's recent decisions in rails-to-trails cases" work to limit the extent of its taking liability to the railbanking provision of the interim trail use agreement as authorized by the NITU issued by the STB. [18] Id. Plaintiffs respond that the government, in taking plaintiffs' reversionary interest in their unencumbered property, is liable to plaintiffs for both the trail use and railbanking authorized by the NITU. In support,

[16] Certain legal and factual disputes remain outstanding for several of the 241 parcels involved in this lawsuit. The court defers resolution of these issues to a later date. Status Report Order, Oct. 26, 2011, ECF No. 68.

[17] As noted above, see note 8, supra, the court construes the government's argument to mean that the federal government, through the NITU, has only mandated that the property be maintained for future rail road purposes, otherwise known as "railbanking." The government argues that it has no liability with respect to interim trail use.

[18] In arguing to limit the scope or extent of its taking, the government argues that it is responsible "for the taking of an *easement* for railroad purposes." Def.'s Cross-Mot at 2 (emphasis added). To avoid confusion, the court emphasizes that it is settled under the Trails Act that, where, as here, the government issues a NITU before abandonment of the rail line, a taking occurs because the NITU blocks plaintiffs' state-law reversionary property interests from vesting. Caldwell, 391 F.3d at 1228. The government does not "take" a property interest by way of an easement. This situation can be distinguished from the third prong of the Preseault II framework, where a taking could occur "even if the grants of the Railroad's easements were broad enough to encompass recreational trails, had these easements terminated prior to the alleged taking so that the property owners at . . . [the] time [that the NITU issued] held fee simples unencumbered by the easements." 100 F.3d at 1533.

plaintiffs argue that interim trail use and railbanking "go hand-in-hand under the Trails Act." Farmers Cooperative v. United States, 98 Fed. Cl. 797, 804 (2011); Pls.' Reply at 13.

For the reasons set forth below, the government's motion for summary judgment limiting the scope of its taking liability to railbanking only is **DENIED**. Contrary to the government's contentions, the court finds that neither the Trails Act nor the Federal Circuit's rails-to-trails precedents may be read so narrowly. The government's taking liability for blocking plaintiffs' right to unencumbered property extends to all of the actions authorized by the government in the NITU. The court bases this conclusion on the language and history of the Trails Act, the Federal Circuit's decisions in Preseault II and Toews v. United States, and the language of the NITU at issue in this case. These reasons are discussed in turn.

### A. The Language and History of the Trails Act Links Railbanking and Trail Use

To begin, contrary to the government's argument, the Trails Act does not reflect an indifference to the creation of recreational trails. See Def.'s Cross-Mot. at 27 ("[16 U.S.C. § 1247(d)] does not state that the Trails Act authorizes any specific type of interim use, nor does it expand the scope of the railroad right-of-way."). Congress passed the first iteration of the Trails Act in 1968. See National Trails System Act, Pub. L. No. 90-543, 82 Stat. 919 (1968). The Railroad Revitalization and Regulatory Reform Act of 1976 supplemented the Trails Act by encouraging the conversion of unused railroad easements to trails. Railroad Revitalization and Regulatory Reform Act of 1976 ("4-R

Act") § 809, Pub. L. No. 94-210, 90 Stat. 144 (codified as amended at 49 U.S.C. § 10905). The Trails Act was also amended in 1978 to expand the federal government's role in protecting trail resources. See National Trails System Act Amendments of 1978, Pub. L. No. 95-248, 92 Stat. 159 (codified as amended in scattered sections of 16 U.S.C.); see also S. Rep. No. 95-636 (1978) (noting that the 1978 amendments would increase the acquisition authority of the Secretary of the Interior). However, neither the 1978 amendment to the Trails Act nor the 4-R Act contained a provision that could preempt state abandonment laws, which would otherwise cause a reversion of the railway right-of-way to adjacent land owners. See Nat'l Wildlife Federation v. I.C.C., 850 F.2d 694, 702 (D.C. Cir. 1988). As a result, a railroad would lose its rights-of-way under state law when the railroad abandoned the rail line, creating a major barrier to trail development. See id.

In response, Congress amended the Trails Act again in 1983, adding provisions designed to facilitate the preservation of rail corridors while at the same time encouraging third parties to acquire the rail corridors for recreational trail use. National Trails System Act Amendments of 1983, Pub. L. No. 98-11, 97 Stat. 42 (codified as amended at 16 U.S.C. §§ 1241-1251 (2006)). Part of the 1983 amendment, codified at 16 U.S.C. § 1247(d), authorized public and private entities to purchase the property interest of unprofitable or inactive rail corridors and convert them into recreational trails for public use. 16 U.S.C. § 1247(d)[19]; 49 C.F.R. § 1152.29 (2011). If demand for the railway

[19] The relevant text of the Trails Act reads:

increased in the future, the railroad could opt to resume rail operations. Id. As such, the language and supporting regulatory scheme of the Trails Act link railbanking to recreational trail use. See Preseault I, 494 U.S. 1, 10 (1990) (affirming that the "Trails Act was reasonably adapted to two legitimate congressional purposes: . . . preserving rail corridors for future railroad use and permitting public recreational use of trails" (internal quotations omitted)). The legislative history of § 1247(d) confirms that Congress had the dual purposes of trail use and railbanking in mind:

> This provision will protect railroad interests by providing that the right-of-way can be maintained for future railroad use even though service is discontinued and tracks removed, and by protecting the railroad interests from any liability or responsibility in the interim period. This provision will assist recreation users by providing opportunities for trail use on an interim basis where such situation exists.

H.R. Rep. No. 98-28, at 8-9 (1983).

---

> The Secretary of Transportation, the Chairman of the Surface Transportation Board, and the Secretary of the Interior, in administering the Railroad Revitalization and Regulatory Reform Act of 1976, shall encourage State and local agencies and private interests to establish appropriate trails using the provisions of such programs. Consistent with the purposes of that Act, and in furtherance of the national policy to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use, in the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise in a manner consistent with this chapter, if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes. If a State, political subdivision, or qualified private organization is prepared to assume full responsibility for management of such rights-of-way and for any legal liability arising out of such transfer or use, and for the payment of any and all taxes that may be levied or assessed against such rights-of-way, then the Board shall impose such terms and conditions as a requirement of any transfer or conveyance for interim use in a manner consistent with this chapter, and shall not permit abandonment or discontinuance inconsistent or disruptive of such use.

16 U.S.C. § 1247(d).

Despite the language of the Trials Act and its history, the government argues that the Trails Act does not authorize interim trail use and thus the government's liability cannot extend to trail use. Rather, the government contends, the language of the Act merely assures that interim use will not be treated as an abandonment of the rail corridor for railroad purposes. Def.'s Cross-Mot. at 27 ("[16 U.S.C. § 1247(d)] does not state that the Trails Act authorizes any specific type of interim use, nor does it expand the scope of the railroad right-of-way; the provision merely states that any interim use cannot be deemed 'an abandonment of the use of [the railroad] rights-of-way for railroad purposes.'" (quoting 16 U.S.C. § 1247(d)). Based on this interpretation, the government concludes that the STB, through the Trails Act, does not authorize an interim use beyond the preservation of the right-of-way for railbanking. Id.

Yet, the government's narrow interpretation of the Trails Act divorces the language of the Act from its history, purpose, and regulatory scheme. The Trails Act scheme does not, as the government contends, authorize only that the railway right-of-way will not be deemed abandoned for railroad purposes if the corridor is railbanked. The preemption of abandonment, which gives rise to the taking, is expressly conditioned on a trail operator reaching an agreement with the railroad for trail use, as well as the trail operator's consent to railbanking. See 49 C.F.R. § 1152.29(d)(1). The Trails Act regulations clearly mandate this link between interim trail use and railbanking. If a trail use agreement cannot be reached, railbanking is not separately permitted. Rather, without a trail use agreement, the railroad will be allowed to abandon the line, and the federal government will lose its jurisdiction over the right-of-way. Id.

The fact that the Trails Act authorizes the federal government to preempt state abandonment laws during negotiations for an interim trail use agreement does not alter the extent of the government's liability in the event a trail use agreement is eventually reached. In the instance where no agreement is reached, the scope of the government's liability is limited to the period of the negotiation. In those cases where an agreement is reached, the government's liability for a taking includes the foreseeable consequences of the agreement between the railroad and trail operator to railbank the corridor and operate a trail. This regulatory scheme is consistent with the language and legislative history behind the Trails Act, from its inception as an act to promote the nation's recreational trails to its present dual purpose in preserving rail corridors for future rail use and encouraging recreational trail development. See Preseault I, 494 U.S. 1, 10 (1990). This intention is affirmed by the Federal Circuit's interpretation of the Trails Act in the context of Fifth Amendment takings actions, to which the court now turns.

**B. Federal Circuit Precedent**

As discussed above, Federal Circuit precedent establishes that a taking occurs when the STB issues a NITU, which "operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right-of-way." Caldwell v. United States, 391 F.3d at 1233-34. Under the Trails Act, what is "taken" is the landowner's reversionary interest in the right-of-way land unencumbered by any easement. In other words, by operation of the Trails Act, the STB works to block the ability of the underlying fee owners to reclaim their property free of any railroad easement. On this all parties agree. See Def.'s Cross-Mot. at 27; Pls.' Reply at 1.

In this case, the dispute arises as to the scope or extent of the taking liability after it is clear that the government has blocked plaintiffs' reversionary interest.[20] The government argues that, regardless of the statutory and regulatory link between railbanking and trail use set forth above, the Federal Circuit has determined that the federal government is liable only for the actions taken by the STB in issuing the NITU, and that the NITU authorizes railbanking and nothing more. Def.'s Cross-Mot. at 28 ("The NITU does not authorize an interim use beyond the scope of underlying easements."). In support of this contention, the government cites the Federal Circuit's recent decisions in Caldwell v. United States, 391 F.3d 1226 (Fed. Cir. 2004), Barclay v. United States, 443 F.3d 1368 (Fed. Cir. 2006), and Ladd v. United States, 630 F.3d 1015 (Fed. Cir. 2010). Def.'s Cross-Mot. at 29-30. Together, these cases hold that, in the context of the Trails Act, a takings claim accrues upon the issuance of a NITU or CITU. See Caldwell, 391 F.3d at 1233; Barclay, 443 F.3d at 1373; Ladd, 630 F.3d at 1023. Ladd further held that because "a takings claim accrues on the date that a NITU issues, events arising after that date—including entering into a trail use agreement and converting the railway to a recreational trail—cannot be necessary elements of the claim." 630 F.3d at 1024. Applying the above-quoted language of Ladd to these facts, the government argues that unless the federal government itself is responsible for creating

[20] The court notes that at oral argument, the government stated that, in practical terms, limiting the scope of the government's taking liability to railbanking only would not affect the valuation of the taking for just compensation purposes. The government suggested that it was, nonetheless, important to define the extent of what the government takes when it blocks the reversionary interest by preempting state law.

the recreational trail, the scope of its taking liability cannot include trail use. Def.'s Cross-Mot. at 30.

The court declines to read Caldwell, Barclay, and Ladd to mandate such a result. Federal Circuit precedent clearly establishes that, in the Trails Act context, the federal government is responsible for the "foreseeable consequences" of its actions in issuing the NITU. The recent holding in Ladd does not alter this precedent. While Ladd certainly holds that all of the elements of a takings claim are present for accrual purposes when the STB issues a NITU, it does not speak to the scope or extent of the government's taking liability beyond accrual. In fact, both Caldwell and Ladd recognize that the nature of a takings claim or the full extent of the taking need not be precisely defined upon accrual of the claim.

**1. The Government Is Liable for the "Foreseeable Consequences" of Its Actions, Including Trail Use as Authorized by the NITU**

In an effort to limit the scope of its taking liability to the railbanking authorized by the NITU, the government asserts that the NITU in this case does not authorize any specific interim use. Def.'s Cross-Mot. at 30. However, this assertion asks the court to ignore the fact that this same argument has been rejected twice before by the Federal Circuit in Preseault II, 100 F.3d 1525 (Fed. Cir. 1996) and Toews v. United States, 376 F.3d 1371 (Fed. Cir. 2004). In Preseault II, the government argued that since the City of Burlington, not the United States, actually established the recreational trail at issue, the United States could not be responsible for a taking. 100 F.3d at 1551. This argument was dismissed by the Federal Circuit, which instead held that "when the Federal

Government puts into play a series of events which result in a taking of private property, the fact that the Government acts through a[n] . . . agent does not absolve it from the responsibility, and the consequences, of its actions." Id. In Toews, the government used the same argument to claim that it should not be responsible for exceeding the scope of the easements at issue in that case, because the City of Clovis, not the United States, implemented the recreational trail. 376 F.3d at 1381. The Federal Circuit, referencing its decision in Preseault II, dismissed this argument as "meritless," instead holding the federal government "responsible for the immediately foreseeable consequences of its actions." Toews, 376 F.3d at 1381-82.

The government contends that Preseault II and Toews are distinguishable from this case on several grounds. The government first asserts that, in Preseault II, both the state and federal governments were "fully invested" in the creation of a recreational trail. 100 F.3d at 1551. Here, the government concludes, plaintiffs cannot present evidence to show that the United States is "fully invested." Def.'s Cross-Mot. at 30-31. Second, the government notes that in finding the United States responsible for a taking, both Preseault II and Toews rely on Hendler v. United States, 952 F.2d 1364 (Fed. Cir. 1991). Def.'s Cross-Mot. at 31. In Hendler, the Federal Circuit held that the United States was liable for a taking based on the actions of state officials pursuant to a formal cooperative agreement with the federal government. 952 F.2d at 1378-79. In this case, the government argues, the federal government is not a party to the trail use agreement. Def.'s Cross-Mot. at 31. Finally, the government argues that Preseault II and Toews—both decided before Caldwell, Barclay, and Ladd—did not expressly consider whether

the United States is liable for third-party trail use after the issuance of the NITU, and therefore do not constitute binding precedent on this issue. Def.'s Cross-Mot. at 32.

To begin, the court does not agree that the Federal Circuit's holdings in Preseault II and Toews turn on whether the federal government was "fully invested" in the development of a recreational trail.[21] The government argues that Preseault II is distinguishable from the present case because in Preseault II, due to the unique factual circumstances of the case, the ICC[22] itself approved the interim trail use agreement between the trail operator and the railway, rather than issuing a NITU that authorized the implementation of a recreational trail. In Preseault II, the Federal Circuit ultimately found that, even though the government did not implement the trail at issue, "the fact that the Government acts through a[n] . . . agent does not absolve it from the responsibility, and the consequences, of its actions." In support of this holding, the Preseault II court explained that "[b]oth the State and Federal Governments were fully invested in the effort to create this public trail." 100 F.3d at 1551. The government concludes, based on this language, that the "investment" of the federal government in the Preseault II trail—in the form of the ICC's approval of the interim trail use agreement—therefore renders

[21] Importantly, these cases focused on the question of whether or not the federal government was liable for a taking in the first instance and not on the extent of that taking liability. Here, of course, the government has conceded liability for certain plaintiffs and has been found liable for a taking with regard to other plaintiffs. Nonetheless, these cases remain relevant because they plainly stand for the proposition that once a taking is established the government's liability extends to the foreseeable consequences of its actions giving rise to that taking liability.

[22] As noted above, the ICC is the predecessor to the STB. See note 1, supra.

Preseault II and its holding inapplicable to this case. Yet, this conclusion is undermined by the Federal Circuit's holding Toews.

In contrast to the unique facts of Preseault II, the development of the trail at issue in Toews proceeded under the standard regulatory scheme of the Trails Act. In Toews—as in this case—the ICC issued a NITU which authorized the implementation of interim trail use and railbanking if the trail operator could reach an interim use agreement with the railroad. 376 F.3d at 1374. The Toews court affirmed that there had been a taking, despite the fact that the federal government did not establish the trail at issue or approve the trail use agreement. In so holding—and this time under the regulatory context relevant to the present case—the Federal Circuit stated, citing Preseault II, that "the Federal government [is] responsible for the immediately foreseeable consequences of its actions." Toews, 376 F.3d at 1382. Therefore, the government's conclusion that the federal government must be "fully invested" in the trail to be liable for the trail use authorized in the NITU fails under the Federal Circuit's holding in Toews.

For similar reasons, the government's reliance on Hendler to limit its takings liability is misplaced. While the Hendler court held that an EPA order granting itself and the State of California authority to construct monitoring wells on private property did not, without more, give rise to a regulatory taking, the court went on to find that that the federal government would be liable for a taking based on the actions of the state officials pursuant to the order. 952 F.2d at 1369, 1375, 1379. The Federal Circuit held that these activities were "attributable to the Federal Government for the purposes of takings law." Id. at 1379. Thus, the fact that the STB in this case did not enter into a formal

cooperative agreement with either Union Pacific or the trail operator, Iowa Natural Heritage Foundation, does not limit the scope of the taking liability. Regardless of whether the federal government itself established the subject trail, the fact remains that the federal government, by issuing the NITU, has blocked plaintiffs' reversionary interests and has allowed the Iowa Natural Heritage Foundation to serve as trail operator on what would be an otherwise abandoned rail line.

It is the federal government's NITU that blocks the reversion of the railroad's easement and gives rise to the taking. It is the NITU's demand for both railbanking and the operation of the trail that defines the extent of the taking liability. If an interim trail use and railbanking agreement fails, the corridor may be fully abandoned (subject to certain conditions), and returned to plaintiffs unencumbered. See 49 C.F.R. § 1152.29(d)(1) (permitting "the railroad to fully abandon the line if no [interim trail use and railbanking] agreement is reached 180 days after [the NITU] is issued," subject to certain conditions). By attempting to limit the scope of its takings liability to the agreement for railbanking only, the government ignores the regulatory mandate that there must be both a railbanking and trail use agreement to prevent the abandonment of the rail corridor, and the attendant conclusion that both railbanking and trail use are "foreseeable consequences," for which the government is responsible, following the issuance of the NITU by the STB.

### 2. The Accrual Rule Set Forth by Caldwell, Barclay, and Ladd Does Not Limit the Scope of the Government's Taking Liability

Finally, the court does not agree with the government that subsequent holdings of the Federal Circuit in regard to the "accrual" date of a takings claim have narrowed the scope or extent of the government's taking liability. As noted above, the Federal Circuit has held that the STB's issuance of the NITU is the federal government action that gives rise to a takings claim under the Trails Act. See, e.g., Ladd, 630 F.3d at 1020. Ladd further held that because "a takings claim accrues on the date that a NITU issues, events arising after that date—including entering into a trail use agreement and converting the railway to a recreational trail—cannot be necessary elements of the claim." Id. at 1024. The government relies on this language in Ladd to argue that, in this case, because trail use was not finalized by the time that the NITU was issued, the scope of the government's taking liability does not extend to the creation and operation of a recreational trail. The court disagrees. While Ladd establishes that a finalized interim trail use agreement is not necessary to determine whether a takings claim has accrued, Ladd does not speak to the ultimate scope of the government's taking liability once that liability is established.

In fact, in Caldwell, the Federal Circuit acknowledged that the issuance of the NITU, while firmly establishing takings claim accrual, authorizes a number of possible takings outcomes:

> Thus, the NITU operates as a single trigger to several possible outcomes. It may, as in this case, trigger a process that results in a permanent taking in the event that a trail use agreement is reached and abandonment of the right-of-way is effectively blocked. Preseault II, 100 F.3d at 1552; see also Toews, 376 F.3d at 1376.

> Alternatively, negotiations may fail, and the NITU would then convert into a notice of abandonment. In these circumstances, a temporary taking may have occurred. It is not unusual that the precise nature of the takings claim . . . will not be clear at the time it accrues.

391 F.3d at 1234; see also Ladd, 630 F.3d at 1025 ("As indicated in Caldwell and Barclay, where no trail use agreement is reached, the taking may be temporary.") (citations omitted). The government's attempt to limit the scope of its taking liability to railbanking, even in the event that an interim railbanking and trail use agreement is reached, is inconsistent with the Federal Circuit's discussion of the possible outcomes arising out of the government's issuance of a NITU. The court declines to categorically limit the scope of the government's taking liability to only the railbanking requirement of the interim use agreement. The government's arguments based on Caldwell, Barclay, and Ladd are for these reasons rejected.[23]

### C. The October 25, 2004 NITU and the Extent of the Government's Taking Liability

It is against this backdrop that the court now turns to the express language of the NITU at issue in this case. The NITU states: "If an agreement for interim trail use/rail banking is reached by the 180th day after service of this decision and notice, interim trail use may be implemented." Pls.' Proposed Findings, Ex. E at 5. The NITU further states

[23] Although for the reasons set forth above the court finds no conflict between Preseault II and Toews and the later cases of Caldwell, Barclay, and Ladd, to the extent that there is conflict between two Federal Circuit decisions, "prior decisions . . . are binding precedent on subsequent panels unless and until overturned en banc." Newell Cos. v. Kenney Mfg. Co., 864 F.2d 757, 765 (Fed. Cir. 1988). Thus, to the extent that Preseault II and Toews are in conflict with Caldwell, Barclay, and Ladd, this court is bound by Preseault II and Toews.

that "[i]f an interim trail use/rail banking agreement is reached, it must require the trail user to assume . . . full responsibility for the management of, any legal liability arising out of the transfer or use of . . ., and for the payment of any and all taxes that may be levied or assessed against, the right-of-way." Id. The government argues that the extent of its liability should be limited to railbanking because the NITU assigns to the interim trail operator, not the government, the obligation for management of the trail, and for any legal liability arising out of trail use. Def.'s Cross-Mot. at 27-28. In addition, the government points out that the STB did not not "analyze, approve, or set the terms for the interim trail use arrangement," STB Policy Statement on Rails to Trails Conversions, No. 274 (Sub-No. 13B), 1990 WL 287255, at *3 (S.T.B. Jan. 29, 1990), and did not have the power to either compel or refuse a trail use agreement, Goos v. I.C.C., 911 F.2d 1283, 1295 (8th Cir. 1990). Def.'s Cross-Mot. at 28.

These facts regarding limitations on the STB's authority are true. However, the fact remains that the Trails Act and the NITU, which give rise to the preemption of state law and the resulting interference with plaintiffs' reversionary rights, clearly authorize interim trail use as well as railbanking. The NITU in this case is not different from the NITUs in other cases where the federal government itself did not establish the recreational trail, but was held liable for the full extent of the actions authorized in the NITU. See, e.g., San Joaquin Valley Railroad Company—Abandonment Exemption—In Frenso County, CA, No. AB-398 (Sub-No. 3X), 1995 WL 617407, at *2, *3 (S.T.B. Oct. 23, 1995) (issuing the NITU in Toews and ordering "[i]f an agreement for interim trail use/rail banking is reached by November 24, 1995 (180 days after the exemption

effective date), interim trail use may be implemented"). As discussed above, the government's lack of involvement in direct management of the trail is immaterial so long as interim trail use was contemplated as a foreseeable consequence of the NITU's issuance. See Toews, 376 F.3d at 1382 ("[T]he Federal government [is] responsible for the immediately foreseeable consequences of its actions.").

In sum, contrary to the government's arguments, the government's taking liability in this case extends to the foreseeable consequences of the actions that arose from issuance of the subject NITU which blocked the ability of the underlying fee owners to reclaim their property free of any railroad easement. Where, as here, a trail use agreement has been consummated, the scope or extent of the government's taking liability is not limited to railbanking only, but extends to all of the uses authorized by the NITU, including the recreational trail.

The court therefore **DENIES** the government's motion for partial summary judgment seeking to limit the scope of its liability to only the continued limitation on the use of plaintiffs' property with regard to "railroad purposes."

## V. CONCLUSION

For the foregoing reasons, plaintiffs' motion for partial summary judgment is **GRANTED**. The government's motion for partial summary judgment is **DENIED**. The parties shall submit a joint status report by **January 20, 2012**. This joint status report shall propose next steps for the resolution of liability with regard to those parcels with remaining legal objections, and for the resolution of any factual objections for those parcels with remaining title disputes. Upon receipt of the parties' joint status report, the

court will schedule a status conference in order to set a final schedule to resolve these remaining legal and factual disputes and for just compensation claims.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge